**IN THE UNITED STATES DISTRICT COURT
FOR THE SOUTHERN DISTRICT OF ALABAMA
SOUTHERN DIVISION**

| | |
|---|---|
| **COMMOTION INVESTMENTS LLC,** *et al.*,     **Plaintiffs,** | ) ) ) ) |
| vs. | )   **CIVIL ACTION NO 07-0836-KD-C** |
| **THE MITCHELL COMPANY, INC.,**     **Defendant.** | ) ) ) ) |

**ORDER**

This matter is before the Court on Defendant The Mitchell Company, Inc.'s Motion for Summary Judgment (Docs. 62, 63, 64), Plaintiffs' responses in opposition thereto (Docs. 70, 71, 72) and Defendant's reply (Docs. 73, 74). For the reasons set forth herein, the Defendant The Mitchell Company, Inc.'s motion for summary judgment (Docs. 62, 63, 64) is **GRANTED.**

**I.     Background**

**A.     Procedural**

Plaintiffs Dorado Investments LLC, Commotion Investments LLC, Sailfish Investments LLC and Tuna Investments LLC ("Plaintiffs" or "the LLCs") initiated this action in the U.S. District Court for Northern District of Florida (CV 09-181-RV) on April 26, 2007, asserting claims against The Mitchell Company, Inc. ("TMC") for breach of contract, fraud and negligent misrepresentation in connection with their collective purchase of a percentage of limited partner interests in University Apartments, d/b/a Eaton Square Apartments, in Florida. (Doc. 1). Specifically, Plaintiffs contend that TMC induced them to enter into an agreement to purchase the limited partner interests for a price based upon certain representations regarding the financial condition of the apartment complex (an April 26, 2002 Pro Forma, a 2002 Appraisal and a May 14, 2002 Projected Stabilized Operating Statement) which were materially false, misleading and/or incomplete. (Id.) Plaintiffs contend that

the financial information that TMC supplied *prior* to closing misrepresented the apartment complex's net rental income, effective gross income, net operating income, property value and net value of investment. (Id.) Plaintiffs contend that TMC manipulated the financial information provided to make the apartment complex appear to be a lucrative investment, but that after Plaintiffs executed the Purchase Agreement with TMC, "actual performance results of ESA [the apartment complex] were well below the thresholds represented by Defendant prior to the closing." (Doc. 1 at 6). See also (Doc. 42 at 3-5). The action was subsequently transferred to this Court on December 11, 2007. (Doc. 19). On March 31, 2008 KWY Investments LLC moved to amend the complaint to be added as a party plaintiff, which was granted, and an Amended Complaint with KWY as a Plaintiff was filed on May 5, 2008. (Docs. 39, 41, 42). On February 11, 2009 TMC filed its Answer to the Amended Complaint (Doc. 53), and on July 9, 2009, moved for summary judgment. (Docs. 62, 63, 64).

**B.    Factual**

    **1.    Parties**

Plaintiffs are five (5) LLCs with citizenship in the State of Florida ("the LLCs"): Commotion Investments LLC (two members – Joseph J. Campus, III and Alan L. McLeod, Jr. who reside in Florida); Sailfish Investments LLC (one member – Betty G. Campus who resides in Florida); Dorado Investments LLC (one member – Joseph J. Campus, IV who resides in Florida); Tuna Investments LLC (one member – Christopher M. Campus who resides in Florida); and KWY Investments LLC (one member – Karen W. Young who resides in Florida). (Docs. 76, 77, 78). Joseph J. Campus, III ("Campus") is the manager and/or authorized representative of the Commotion, Sailfish, Dorado and Tuna limited liability companies. (Doc. 72-2 at 2). Defendant

The Mitchell Company, Inc. ("TMC") is an Alabama corporation with its principal place of business in Mobile, Alabama, and which acquires, develops, and sells real estate.

### 2. **The Purchase Agreement**

In 1999, TMC owned and operated the apartment complex with non-party Southeastern Partners, Inc., as the limited partnership University Apartments, Ltd.[1] (Doc. 13-9; Doc. 13-10; Doc. 71-5 (Dep. J. Young at 38)).

In 2002, TMC decided to sell a limited partner interest in the apartment complex and began seeking buyers; Joe Campus[2] brought the apartment complex investment possibility to James ("Jim") Arthur Young's attention. (Doc. 71-5 (Dep. J. Young at 36); Doc. 64-3 (Dep. O'Sullivan at 23)). In response, Jim Young ("Young") told Campus that he would need to review the Pro Formas and budgets with his financial counselors (namely J. Mort O'Sullivan ("O'Sullivan") and his group O'Sullivan Creel, LLP) before making a decision and further, that he would require that Campus also be an owner in the project and manage the property as one of the owners. (Id.)

TMC supplied to Young the requested financial information which included Historical Financial Data, a Pro Forma,[3] an Appraisal and a Projected Stabilized Operating Statement. (Doc. 71-5 (Dep. J. Young at 38-43, 223-224, 227, 234-235)). Young then delivered the projections and documents to O'Sullivan. (Id. at 37).

According to a report prepared by Jeff DeWeese, Plaintiffs' expert on economic damages,

---

[1] This partnership had been created in June 1997. (Doc. 13-9; Doc. 13-10).

[2] At the time, Joseph Campus ("Campus") was a director and officer of TMC.

[3] According to the LLCs' expert, DeWeese, a good definition for a Pro Forma is a projection or educated guess of the future. (Doc. 71-6 at 99).

the financial documents[4] which TMC gave to the LLCs provided the following information regarding the apartment complex: the April 26, 2002 Pro Forma represented an annual net operating income of $1,496,907; the May 14, 2002 Projected Stabilized Operating Statement of the apartment complex for the years 2001 and 2002 (including the *projected performance* of the apartment complex at 90% occupancy for the remainder of 2002) reflected (in relevant part) as follows:

|  | **2001** | **2002** |
|---|---|---|
| **Total revenue** | $1,846,347 (avg $153,862/mth) | $1,915,099 (avg $159,591/mth) |
| **Operating Income** | $1,180,729 (avg $98,394/mth) | $1,367,937 (avg $113,995/mth); |

and a March 22, 2002 Appraisal[5] prepared by CB Richard Ellis, Inc. showed the following (relevant) appraised amounts for the apartment complex:

| **Total revenue** | $1,983,631 |
|---|---|
| **Operating income** | $1,230,170 |

(Doc. 71-3).

As part of this process, Young had O'Sullivan review the apartment complex operation to calculate potential returns based on the numbers that he had received. (Doc. 64-3 (Dep. O'Sullivan at 23))  O'Sullivan along with his staff and their wealth management division evaluated the apartment complex investment, and after running "at least" 12 business plans using different price numbers and contingencies, eventually gave Young the "okay" to proceed with the purchase. (Doc.

---

[4] The Court does not have these actual document in the record, only DeWeese's report which draws conclusions from same and includes information from same. (Doc. 71-3). The parties do not dispute the figures provided by DeWeese. Also, in this Report, it appears that DeWeese mistakenly mislabels the May 14, 2002 projected stabilized operating statement an Operating Analysis and mislabels the April 26, 2002 pro forma as a projected stabilized operating statement. As the underlying documents have not been filed, the Court can only speculate about these inconsistencies.

[5] Plaintiffs' Amended Complaint references a June 2002 Appraisal. (Doc. 41 at ¶ 21). The Court can find no reference to any appraisal other than the March 22, 2002 appraisal and as such, presumes this to be a typo in the pleading.

4

71-5 (Dep. J. Young at 37-38)). O'Sullivan did not recall that the Operating Results that were given to him were determined to be incorrect. (Id. at 47). O'Sullivan also did not believe that any of the Historical Data that TMC provided was inaccurate. (Id. at 78).

O'Sullivan was provided with financials for the period ending May 31, 2002, and documents showing summary totals for the year 2001, as supplied by TMC employee Lindsey Boney on June 17, 2002, prior to the closing. (Id. at 79). O'Sullivan did not recall whether any analysis of the reasonableness of the projections based on past operating results had been conducted, but admits he has no record of such analysis being conducted. (Id. at 74). O'Sullivan also did not recall conducting any comparisons of past operating results with the projected results and does not know why he did not. (Id. at 190). O'Sullivan did not perform a due diligence study – he was asked to make calculations as to what the Pro Forma numbers would show in an internal rate of return. (Id. at 74).

In making his decision to purchase the apartment complex limited partner interest, Young did not rely solely on O'Sullivan's findings; his decision was based 70% on the meetings with O'Sullivan, while the other due diligence process was conducted by Young himself (reviewing comparable sales, sending out real estate people he trusted to interview similar projects and check their numbers, as well as conducting an investigation into the validity of the TMC supplied numbers (relating to occupancy and turnover) to see what similar projects were experiencing in the market place). (Doc. 71-5 (Dep. J. Young at 39-41)). Young made the final decision and admits that "[i]t's still a risk in the world of business any time in the real estate business." (Id. at 39).

The individual members of the relevant LLCs (Karen Young, Betty Campus, John Campus, Christopher Campus) testified that they did not conduct their own due diligence but rather, relied

entirely upon the representations made to them by Campus [(Doc. 64-7 (Dep. Betty Campus at 9, 11, 13, 14, 21), Doc. 64-8 (Dep. J. John Campus, IV at 24-26) and Doc. 64-9 (Dep. Christopher Campus at 15, 21)] or Jim Young (Doc. 64-10 (Dep. Karen Young at 20-22, 27, 29). After making the decision, Young, Campus and O'Sullivan contacted Pensacola, Florida attorney Eddie Matthews, to review the legal documentation and prepare a contract for the purchase of the apartment complex. (Doc. 64 at Ex. 4 (Dep. Edsel F. Matthews, Jr. at 23)).[6]

On June 21, 2002, the LLCs and TMC executed a Purchase Agreement.[7] (Doc. 1 at 13-26). Specifically, TMC and another non-party entity (Southeastern Partners, Inc.) sold a 99% limited partner interest in the apartment complex to non-parties MAB Investments LLC (15%), RSB Investments LLC (15%), JMO Investments LLC (4.5%) and EFM Properties LLC (4.5%), and party-plaintiffs Dorado Investments LLC (2.6%), Commotion Investments LLC (19.9%), Sailfish Investments LLC (19.9%), Tuna Investments LLC (2.6%) and KWY Investments LLC (15%), for $2,975,000 (a total value for the property of $14,100,00 less a mortgage assumed of $11,200,000). (Doc. 1 at 26; Doc. 71-2; Doc. 71-3 at 2).

The Purchase Agreement (in which the LLCs are the "Buyer" and "limited partners" and TMC and Southeastern are the "Sellers" and "General Partner") provides, in relevant part, as follows:

- the purchase price shall be paid through a non-recourse promissory note from the Buyer to the Seller bearing simple interest at the rate of 7% per annum amortized over 20 years with a 5 year balloon and that if the general partner is removed by the limited partner the note will become immediately due and

---

[6] O'Sullivan also purchased his own interest, via an LLC, in the apartment complex; however, he is not a party to this litigation. (Doc. 64 at Ex. 2 at 92-94).

[7] The LLCs comprise the majority of the "Limited Partners" in the agreement. (Id.) TMC and non-party Southeastern Partners, Inc., are deemed the "General Partner" in the agreement. (Id.)

      payable ($875,000) (¶3.1);

- the closing shall be held on June 21, 2002 (¶4);

- the Seller represents and warrants to the Buyer that it has delivered the financial statements of the partnership and that they are true and correct (¶5.3);

- the Seller represents and warrants that no representation or warranty that it furnished to the Buyer in the agreement or otherwise contains or will contain any untrue statement of a material fact or omits or will omit any material fact required to make such statements not misleading (¶5.11);

- Seller guaranteed that the minimum net collected rent for July-October of 2002 shall be at least $117,021/month and if it is less than that, Seller shall make up the shortfall within 15 days of the end of each month (¶5.14);

- Buyer represents and warrants to the Seller that it is purchasing the LP interest under the agreement for investment not resale (¶6.1);

- The Buyer's obligation to perform shall be subject to satisfaction of the condition (before or contemporaneous with closing) that the warranties and representations of Seller shall be true as to the date of the agreement and shall continue to be true until closing (¶7.1);

- The limited partners have the right to replace the general partner upon the occurrence of certain events (failure of partnership to make cash distribution to limited partners of at least $112,500 per calendar quarter for 2 consecutive quarters, to maintain an average occupancy rate of at least 94% for any 60 consecutive day period or to collect gross money rental income of at least $165,432 for at least two consecutive calendar months) (¶7.4);

- Any notice, communication, request, approval or consent that may be given or that is required to be given under the terms of the agreement shall be in writing and shall be sent certified mail return receipt requested to the address for each party shown on the partnership records (¶8);

- The agreement shall be governed in its enforcement, construction and interpretation by the laws of the state of Florida (¶9); and

- The agreement constitutes the entire agreement and may not be amended/modified except in a writing signed by both parties and all prior understanding and agreements between the parties are merged in the agreement which alone fully and completely expresses their understanding

(¶14).

(Doc. 1 at 13-26). The Purchase Agreement also provided that $875,000 of the purchase price would be funded through a promissory note from the limited partners to TMC (TMC loaned $875,000 to the LLCs at 7% interest and the note became immediately due and payable if TMC was removed as general partner). (Id.)

The parties subsequently executed an Amendment to the Purchase Agreement (undated) which provides, in relevant part, that the limited partners owning 75% of the limited partnership interests shall have the right to replace the general partner upon the occurrence of any one of certain events (the failure of partnership to make cash distribution to limited partners of at least $112,500 per calendar quarter for 2 consecutive quarters, the failure to maintain an occupancy rate "of less that 94% for sixty consecutive days[,]" or the failure of the partnership to collect gross money rental income of at least $165,432 for at least two consecutive calendar months), and that upon replacement of the general partner, the general partner's 1% interest would be purchased by the new general partner for $30,000. (Id. at 20-21 at ¶8).

Shortly after executing the Purchase Agreement in June 2002, the L.L.C.'s changed the management of the apartment complex. (Doc. 71-5 at 41-42). According to DeWeese, the on-site property managers provided a 2003 management plan[8] which was different from the projections that TMC had provided. (Doc. 71-3 at 4). Sometime in early 2003,[9] Young concluded that the projected

---

[8] Plaintiffs have not provided this document for the Court's review. After diligently searching the record, the Court is unable to discern anything about this plan other than the projected income in the plan was lower than TMC's April 2002 pro forma projections. Specifically, it is even unclear who produced the management plan. Accordingly, the court gives no consideration to the management plan.

[9] While unable to provide an exact date, O'Sullivan believes that the meeting with Coffey occurred in early 2003 around the time they received the 2003 budget (printed January 7, 2003). (Doc. 64-3, Dep. O'Sullivan at 39, 41).

numbers did not match the apartment complex's actual performance or the 2003 Management Plan. Mr. Young contacted Pat Coffey, an employee of TMC who managed multifamily projects, about his concerns. (Doc. 64-2 (Dep. J. Young at 42-44)). The actual results for the apartment complex in 2002 and 2003 were (in relevant part) as follows:

|  | **2002** | **2003** |
|---|---|---|
| **Effective gross income** | $1,876,478 | $1,760,591 |
| **Net operating income** | $922,002 | $924,769 |

(Doc. 71-3 at 6).

Thereafter, the parties met and discussed TMC's removal as General Partner according to the terms of the Purchase Agreement. (Doc. 72-2 at 3 (Campus Affidavit)). On October 16, 2003, O'Sullivan sent a letter to John Saint of TMC offering 55% of the LLCs' limited partner interests in the apartment complex before they were offered to outside purchasers; TMC did not respond. (Doc. 71-3 at 5). In late 2005, the LLCs sold the apartment complex for a profit (it was purchased for $14 million and was listed in January 2005 for $15.8 million). (Doc. 61-4 (Dep. J.Young at 525-528); Doc. 71-4 (Young Affidavit)).

## II.     Discussion[10]

### A.     Relevant Law

Summary judgment should be granted only if "there is no genuine issue as to any material fact and that the movant is entitled to judgment as a matter of law." FED. R. CIV. P. 56(c).[11] The

---

[10] The LLCs are comprised of members who are citizens of Florida, the apartment complex at issue is located in Pensacola, Florida, and pursuant to the terms of the Purchase Agreement, the agreement "shall be governed in its enforcement, construction, and interpretation by the laws of the state of Florida." (Doc. 1 at 17 at ¶9). Thus, Florida law governs the claims in this action.

[11] Rule 56(c) of the Federal Rules of Civil Procedure, provides that summary judgment shall be granted:

party seeking summary judgment bears "the initial burden to show the district court, by reference to materials on file, that there are no genuine issues of material fact that should be decided at trial." Clark v. Coats & Clark, Inc., 929 F.2d 604, 608 (11th Cir. 1991). The party seeking summary judgment always bears the "initial responsibility of informing the district court of the basis for its motion, and identifying those portions of 'the pleadings, depositions, answers to interrogatories, and admissions on file, together with the affidavits, if any,' which it believes demonstrate the absence of a genuine issue of material fact." Id. (quoting Celotex Corp. v. Catrett, 477 U.S. 317, 323 (1986)). If the nonmoving party fails to make "a sufficient showing on an essential element of her case with respect to which she has the burden of proof," the moving party is entitled to summary judgment. Celotex, 477 U.S. at 323. "In reviewing whether the nonmoving party has met its burden, the court must stop short of weighing the evidence and making credibility determinations of the truth of the matter. Instead, the evidence of the non-movant is to be believed, and all justifiable inferences are to be drawn in his favor." Tipton v. Bergrohr GMBH-Siegen, 965 F.2d 994, 998-999 (11th Cir. 1992), cert. den., 507 U.S. 911 (1993) (internal citations and quotations omitted). The mere existence of a factual dispute will not automatically necessitate denial; rather, only factual disputes that are material preclude entry of summary judgment. Lofton v. Secretary of Dep't of Children & Family Serv., 358 F.3d 804, 809 (11th Cir. 2004), cert. den., 534 U.S. 1081 (2005).

---

> if the pleadings, the discovery and disclosure materials on file, and any affidavits show that there is no genuine issue as to any material fact and that the movant is entitled to judgment as a matter of law.

FED. R. CIV. P. 56(c).

**B.     Analysis**

TMC's motion for summary judgment is due to be granted in its entirety. Plaintiffs have failed to make a sufficient showing on the essential element of their case with respect to which they bear the burden of proof – namely, the LLCs have utterly failed to submit any evidence, whatsoever, supporting their contention that TMC supplied false or inaccurate financial information to them before the June 21, 2002 closing. Specifically, in their complaint the Plaintiffs assert that the financial information supplied by Defendant prior to closing misrepresented Eaton Square Apartment's net rental income, effective gross income, net operating income, property value and net value of investment. However, in defense of the summary judgment Plaintiffs have not put forth any evidence to show that the representations, from a historical standpoint, were false. In fact, as outlined *supra* the only evidence before the Court is that the historical financial information provided by TMC was not incorrect.

Instead, Plaintiffs are hanging their hat on the assertion that TMC provided them with financial projections, estimates or forecasts about *the future* of the complex that did not ultimately match the complex's real world performance. Specifically the LLCs assert that before closing, TMC manipulated the financial information provided to make the apartment complex appear to be a lucrative investment. In their complaint, Plaintiffs reference the April 2002 Pro Forma, a March[12] 2002 Appraisal and a May 2002 Projected Stabilized Operating Statement as support for their claims. However, again, Plaintiffs fail to present any evidence to support their general contention that TMC manipulated numbers to produce false projections. Instead, the Plaintiffs appear to solely rely on the DeWeese expert report to establish liability. This reliance is misplaced because the

---

[12] See *supra* note 5.

report is merely an attempt to calculate damages and as stated by the Deweese, does not "analyze or reach an opinion on the liability issue in this case." (Doc 71-3). With these general observations in mind, the Court will analyze the specific causes of action alleged by Plaintiffs.

**Regarding the breach of contract claim**, Florida law requires the LLCs to plead and establish: 1) the existence of a contract; 2) a material breach of that contract; and 3) damages resulting from the breach. See, e.g., Friedman v. N.Y. Life Ins. Co., 985 So.2d 56, 58 (Fla. 4th DCA 2008); Rollins, Inc. v. Butland, 951 So.2d 860, 876 (Fla. 2nd DCA 2006). The LLCs allege that "[b]y providing materially inaccurate and misleading financial statements and projections[,]" to them before the closing, TMC "breached its representations and warranties" in the June 21, 2002 Purchase Agreement. (Doc. 42 at 6). Specifically, the LLCs assert that TMC breached Paragraphs 5.3 and 5.11 of the Purchase Agreement by providing false financial statements – that TMC induced them to purchase the limited partner interests by making misrepresentations as to the financial condition and profitability of the apartment complex.

At the outset, Paragraph 5.3's "true and correct" representation applies only to the financial statements attached to the Purchase Agreement as Exhibit B. The allegedly inaccurate projections were not attached as Exhibit B to the Purchase Agreement. Regardless, Paragraph 5.11, which is broader in scope, prohibits untrue statements of a material *fact* or omission of a material *fact*. O'Sullivan, Young, Campus and the LLCs' expert DeWeese, all testified that they could find nothing inaccurate about the historical financial data provided by TMC (*i.e*., the actual numbers for the apartment complex). As to the projections provided by TMC (*i.e*., the pro forma, appraisal and projected operating statements), quite inexplicably, the LLCs have submitted no evidentiary support for this claim – *not even the allegedly inaccurate and misleading financial documents that TMC*

*supposedly provided to them . . . <u>the very underlying documents with which they take issue</u>*. Rather Plaintiffs, in a one page response regarding the contract claim, simply utter the mantra that the projections were false and misleading because they did not match the actual results. The Plaintiffs then point to a chart contained in DeWeese's Report which purports to condense information gleaned from the underlying documents to compare the appraisal and projection values provided by TMC with the 2002 and 2003 actual values. (Doc. 70 at 5 (citing Doc. 71-3 at 6)). However, this chart simply shows that the projections didn't match actual performance. In sum, Plaintiffs have failed to sustain their burden of proof to withstand summary judgment on the breach of contract claim.

**Concerning fraud and negligent misrepresentation**, the LLCs' claims against TMC are based upon the assertion that TMC "intentionally understated the operating expenses" of the apartment complex "and failed to disclose information about operating expenses it expected to incur[]" and that TMC's statements were material, false and deceptive, made with knowledge of their falsity, materiality and intended to deceive the LLCs and "induce" them "into entering into the Purchase Agreement." (Doc. 42 at 7). The LLCs allege that TMC misrepresented and concealed true material facts to the LLCs (financial information), with the intention that the misrepresentations would induce the LLCs to act on them. (<u>Id</u>. at 8).

In Florida, there is a four (4) year statute of limitations for fraud and negligent misrepresentation. FLA. STAT. ANN. § 95.11. The statute begins to run at the time that the cause of action accrues. Indeed, Section 95.031 provides that such an action must be begun with the period prescribed with the period running from the time the facts giving rise to the cause of action were discovered or should have been discovered with the exercise of due diligence. FLA. STAT. ANN. §

95.031(2)(a). The Purchase Agreement was executed on June 21, 2002. The record reveals that questions arose about the alleged discrepancies in the apartment complex's financials – at the latest – when the 2003 budget was published in January 2003, such that discovery of the alleged fraud and negligent misrepresentation runs from that date.[13] See *supra*. Accordingly, the LLCs had to bring the fraud and negligent misrepresentation claims no later than four (4) years from January 31, 2003; thus, no later than January 31, 2007. The LLCs did not initiate this action until April 26, 2007 (Doc.1), almost three (3) months after the statute of limitations had expired. Further, the LLCs have conceded that this action was brought outside the applicable statute of limitations period for fraud and negligent misrepresentation. (Doc. 72 at 4). Accordingly, the LLCs' fraud and negligent misrepresentation claims are time-barred.

Moreover, while the LLCs assert that the doctrine of equitable estoppel saves these claims from dismissal (claiming that TMC promised to forego certain rights under the June 21, 2002 Promissory Note – the right to accumulated interest and the ability to call the Note – to induce the LLCs not to pursue litigation), the Court cannot agree. The LLCs contend that they reached an agreement with TMC, not to sue TMC, after discovering the alleged financial discrepancies because TMC offered to forego calling the note and to forego interest in the $875,000 loan that TMC had made to the LLCs. (Doc. 70 at 8-9, Doc. 72 at 5-6)). However, in filing this very litigation in April 2007, the LLCs breached that agreement with TMC, such that they appear to have unclean hands and cannot, now, avail themselves of the doctrine of equitable estoppel. See Precision Instrument Mfg. Co v. Automotive Maint. Machinery Co., 324 U.S. 806, 815 (1945) ("[t]he guiding doctrine

---

[13] The specific date in January is uncertain and so considering the evidence in a light most favorable to plaintiffs, the Court presumes that the discovery occurred on the last day of January - January 31, 2003.

in this case is the equitable maxim that 'he who comes into equity must come with clean hands[]'"). The fact that TMC subsequently sued the LLCs for breach of the terms of the promissory note in 2009 (CV 09-207) is irrelevant.

Furthermore, the LLCs have utterly failed to submit any documents showing either the operating expenses or the purported falsity of the operating expenses, much less how the failure of TMC's projections' matching the actuals evidences fraud and/or negligent misrepresentation. Thus, even if the claim was not time barred, summary judgment is due to granted for TMC on the substance of the claim.

### III.     Conclusion

Based upon the foregoing, the Court finds that Defendant The Mitchell Company, Inc's Motion for Summary Judgment (Docs. 62, 63, 64) is **GRANTED.**

**DONE** and **ORDERED** this the **25th** day of **September 2009.**

/s/ Kristi K. DuBose
**KRISTI K. DuBOSE**
**UNITED STATES DISTRICT JUDGE**